J-S18031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE MATTER OF: M.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2066 EDA 2016 |

Appeal from the Order Entered May 31, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  AP# CP-51-AP-0000420-2016,
DP# CP-51-DP-0002822-2014, FID# 51-FN-002570-2014

BEFORE:   PANELLA, SOLANO, and FITZGERALD[*], JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MAY 17, 2017**

R.M. ("Father") appeals from the order that involuntarily terminated his parental rights to his daughter, M.S. ("Child"), born in November of 2014.[1]   Father claims that the trial court erred in finding clear and

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By separate orders dated May 31, 2016, the trial court involuntarily terminated the parental rights of K.K.S. a/k/a K.S. ("Mother") and any unknown father.  Neither Mother nor any unknown father filed a notice of appeal from the respective orders.  We note that although there was some dispute regarding whether Father submitted to a paternity test, there was no indication in a result of such testing was received.

The trial court also issued a goal change order dated May 31, 2016. Because Father has not challenged the goal change, we will not address it in this appeal.  ***See Krebs v. United Ref. Co. of Pa.***, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved. . . ." (citations omitted)).

convincing evidence for termination under 23 Pa.C.S. § 2511(a)(1), (2), and (b). We affirm.

Shortly after Child's birth in November of 2014, the Philadelphia Department of Human Services ("DHS") received a report that Child, along with Mother, tested positive for opiates. Mother was discharged shortly after Child's birth. However, Child remained hospitalized. DHS visited Mother at her home, and she admitted using drugs. DHS observed that Mother did not have the necessities to care for Child.

On December 4, 2014, upon Child's discharge from the hospital, the trial court placed Child in the protective custody of DHS. The dependency petition initially listed Child's father as M.F., with whom Mother had another child. The court adjudicated Child dependent on December 11, 2014. Subsequently, M.F. was determined not to be Child's biological father, and Father became known to DHS. The Community Umbrella Agency ("CUA") established a single case plan ("SCP") objective for Father to make his whereabouts known to CUA.

Father appeared at the first permanency review hearing on March 12, 2015, and counsel was appointed. The court directed a paternity test for Father and supervised visits. Father did not appear at the next three permanency review hearings conducted on June 11, 2015,[2] August 27,

_____

[2] The trial court again ordered Father to appear for a paternity test on June 11, 2015.

2015, and January 14, 2016, although Father's counsel was present at these hearings. According to Father, he was incarcerated from May or June of 2015 until April of 2016.[3]

On May 12, 2016, one month after Father's release from custody, DHS filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). A hearing was held on May 31, 2016.

With respect to Father, Sharon Palmer, a CUA supervisor at Catholic Community Services, testified that Father (1) never met Child, (2) did not visit with Child, (3) did not respond to letters from her agency, (4) did not call the agency, and (5) could not be located when CUA workers went to the address he provided the agency. N.T., 5/31/16, at 24, 29-32. Additionally, Ms. Palmer testified that her file did not contain documentation that Father submitted to a paternity test. *Id.* at 24. On cross-examination by Father's counsel, Ms. Palmer conceded that Father met his single goal of making his whereabouts known by appearing at the March 12, 2015 permanency review hearing. Ms. Palmer further stated that she did not attempt to contact Father personally until May 23, 2016, eight days before the hearing, and

---

[3] The record reveals that Father entered a guilty plea on May 26, 2015, for drug crimes. DHS Ex. 8, at 4. In addition, the record reveals that Father has an extensive criminal history involving robbery and theft. DHS Ex. 8, at 1-10.

that she did not personally conduct clearances or a home assessment for Father. *Id.* at 37-39, 42.

Michelle Jackson, a caseworker at Catholic Community Services, testified that Child and foster parent had a "very close bond." *Id.* at 47. The remainder of Ms. Jackson's testimony related to Mother, not Father.

Father testified on his own behalf and acknowledged that he appeared at the March 12, 2015 permanency review hearing. *Id.* at 77-78. According to Father, CUA did not give him a visitation schedule or other objectives except making himself known to DHS. *Id.* at 78. Father did not personally contact CUA to inform the agency of his incarceration. *Id.* at 79. Instead, Father contacted his family members, including his female cousin, T.F., to ask whether they "heard anything . . . ." *Id.* at 79. Father asserted that he received no response to his inquiries. *Id.* Additionally, Father asserted that he took parenting classes while in prison and entered into evidence a letter from one of his classes. *Id.* at 80.

Father also testified that he met Child "about three times" during Mother's supervised visitations. *Id.* at 78-79, 83. He requested visitation with Child, and concluded that he was in a position to take Child, but CUA had not assessed his home. *Id.* at 83. On cross-examination, Father conceded that he did not request additional visitation "[b]ecause the paternal results didn't come back and [he] wasn't sure . . . ." *Id.* at 90. He further acknowledged that he had a lawyer for the dependency and

termination proceeding, as well as a social worker in prison, but did not contact CUA for additional visitation though them. *Id.* at 89-90.

T.F., Father's cousin, also testified at the hearing. T.F. asserted that she attempted to help Father complete a paternity test and requested kinship care for Child. *Id.* at 94-95. T.F. testified that she was in contact with "Mr. Walt," whom she believed was with the foster agency or DHS, a "few times a month," and informed Mr. Walt of Father's incarceration on three occasions. *Id.* at 95-99.

By order dated May 31, 2016, the trial court involuntarily terminated Father's parental rights. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on August 17, 2016.

In its opinion, the trial court stated that it found the testimony of Father and his cousin, T.F., incredible. Trial Ct. Op., 8/17/16, at 5. The court instead found credible the testimony of Ms. Palmer, the CUA supervisor. *Id.* The court noted:

> [The CUA] supervisor testified that Father had one [ ] SCP objective. The SCP objective for [F]ather was to make his whereabouts known to CUA. On March 12, 2015, [F]ather appeared at a Permanency Hearing and provided the [c]ourt with an address. The CUA supervisor testified that two CUA workers visited the address provided. Furthermore, letters were sent to the address which contained CUA's contact information. Lastly, attempts were made to contact [F]ather by telephone. Father never responded to CUA's attempts to contact him.

On March 12, 2015 and June 11, 2015, [F]ather was ordered by the court to submit to a paternity test and to visit with the child. Father did not submit to a paternity test. Furthermore, [F]ather never did visit [ ] with [Child]. The CUA supervisor testified that they were unable to schedule visits with [F]ather because he never responded to CUA's attempts to contact him.

*Id.* at 3 (citations to record omitted). Thus, the court concluded Father failed to perform his parental duties. *Id.*

On appeal, Father presents the following issues for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. § 2511 subsections (a)(1) and (a)(2)?

2. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Father's] parental rights best serves the Child's developmental, physical and emotional needs and welfare?

Father's Brief at 4.

Father first argues that the evidence was insufficient to terminate his parental rights pursuant to Section 2511(a). The crux of Father's argument is that DHS did not make reasonable efforts to reunify him with Child. Father supports this contention by insisting that he was fully compliant with his Single Case Plan by making his whereabouts known. *Id.* at 9. Father notes CUA did not evaluate his home, perform background clearances on him, or arrange visitation between him and Child. *Id.* at 9-10. He avers that Sharon Palmer, the CUA supervisor, failed to contact him, and only called him once, eight days before the termination hearing. *Id.* at 9. Father also notes that although Ms. Palmer testified that she was not aware of his

incarceration, T.F. testified that she informed Mr. Walt of Father's incarceration. *Id.* at 9-10. Further, Father asserts that he has overcome any barriers that would prevent reunification, completed a parenting class while incarcerated, and is "ready to have the Child placed in his care." *Id.* No relief is due.

We review Father's appeal according to the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis

pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we review the trial court's termination of Father's parental rights pursuant to Section 2511(a)(1), which provides:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

Section 2511(a)(1) requires that "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation

> to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

When the evidence establishes a failure to perform parental duties, the trial court must further consider:

> (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d at 730 (citation omitted). With respect to incarceration, our Supreme Court has emphasized:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.** Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (citation omitted) (emphasis added).

This Court has also rejected the suggestion that a parent is "only required to attempt the level of parenting consistent with his and the agency's knowledge of parentage." *In re Z.S.W.*, 946 A.2d at 731 (quotation marks omitted). We reasoned: "To adopt [such a] rationale would relieve all fathers of their parental duties until their parentage was confirmed by a paternity test." *Id.*

Instantly, the trial court made credibility determinations that despite appearing at the first permanency review hearing, Father failed to maintain contact with Child or CUA. *See* Trial Ct. Op. at 3, 5. The court's determination was supported in the record by Ms. Palmer's testimony that Father did not contact CUA, did not respond to CUA, and could not be located by two CUA employees that went to his home. Additionally, Ms.

- 10 -

Palmer testified that Father did not inform CUA that he was incarcerated between May of 2015 and April of 2016.

Although Father stated he instructed T.F. to tell CUA that he was in prison, and T.F. testified that she informed "Mr. Walt" of Father's incarceration, the trial court was within its province as the finder of fact to reject that testimony. *See In re T.S.M.*, 71 A.3d at 267. Similarly, the trial court was entitled to reject Father's testimony that he visited with Child three times on his own accord during Mother's supervised visits. In any event, it is significant that when asked why he did not request additional visitations, Father asserted that he was awaiting the results of the paternity tests. *See In re Z.S.W.*, 946 A.2d at 731.

We also note that Father was incarcerated for approximately the first five of the six months preceding the filing of the petition to terminate his parental rights. Although this incarceration is not alone dispositive, Father conceded that he had resources available to him while in prison, namely, his court-appointed attorney in this matter, as well as a prison social worker. Father admitted he did not take efforts to reach out to CUA through these resources.

In light of the foregoing, we discern no basis to disturb the trial court's findings and credibility determinations that Father undertook no efforts to cultivate a parent-child relationship or demonstrate a willingness or capacity to undertake a parental role. We further find ample support for the court's

legal conclusion that Father's conduct in the six months immediately preceding the filing of the petition to terminate his parental rights failed to perform his parental duties. Moreover, we agree with the court's analysis that Father's lack of diligence in performing his parental duties caused CUA's inability to provide services for him. Thus, we conclude the court properly found the grounds for termination under Section 2511(a)(1).

In his second issue, Father argues that the court erred in terminating his parental rights pursuant to Section 2511(b). Specifically, Father asserts that "[a]ny lack of a bond that the child has with Father is due to the agency not following court orders to set[]up a visitation schedule. Father believes that with consistent visitation, Child will be ready to reunify with him." Father's Brief at 13-14. No relief is due.

Section 2511(b) states, in relevant part:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

This Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of

permanently severing that bond." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citations omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

Moreover,

> in addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re A.S.***, 11 A.3d 473, 483 (Pa. Super. 2010) (citation omitted). Further, our Supreme Court has stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents" and directs "courts . . . keep the ticking clock of childhood ever in mind." ***In re T.S.M.***, 71 A.3d at 268-69 (citation omitted).

Instantly, there is no evidence of a parent-child bond between Father and Child. Child was born in November 2014, was placed in the care of DHS in December 2014. Father attended one hearing regarding Child. However, shortly thereafter, Father was incarcerated, and remained in prison until one month before the filing of the petition to terminate his parental right in May

2016. The CUA supervisor, Ms. Palmer, testified that Child has never met Father. N.T. at 32. Moreover, even accepting Father's testimony that he visited with Child three or four times during Mother's scheduled visitations, we discern no suggestion from the record that a parental bond was formed or existed. Therefore, it was reasonable for the trial court to infer that a bond did not exist. *See In re K.Z.S.*, 946 A.2d at 762-63. Moreover, as discussed above, we discern no merit to Father's assertion that the absence of a bond is the result of CUA not scheduling supervised visits, rather than Father's failure to perform his parental duties.

The evidence also reveals that a parent-child bond exists between the foster parent and Child. N.T. at 47. Child has resided in the same foster home since her placement shortly after birth, and it is a pre-adoptive resource. *Id.* at 9. As such, we discern no abuse of discretion by the trial court in concluding that terminating Father's parental rights serves the developmental, physical and emotional needs and welfare of Child pursuant to Section 2511(b).

Accordingly, because we find no abuse of discretion in the trial court's credibility findings and legal conclusion regarding Section 2511(a)(1) and (b), we must affirm. *See In re T.S.M.*, 71 A.3d at 267.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/2017